## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BWA LPW LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. |
| | ) | |
| DAVID H. ALLEN, | ) | |
| BWA WELLESLEY LLC, and | ) | **JURY TRIAL DEMANDED** |
| PROVIDENCE FINANCIAL | ) | |
| ADVISORS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## VERIFIED COMPLAINT

Plaintiff BWA LPW LLC d/b/a Balance Wealth Advisors ("BWA"), by its attorneys Epstein Becker & Green, P.C., brings this action against Defendants David H. Allen, BWA Wellesley LLC, and Providence Financial Advisors, LLC ("PFA") for preliminary and permanent injunctive relief, specific performance, and damages, and states as follows:

## NATURE OF THIS ACTION

1.      This is an action for injunctive relief and damages for Defendants' willful, knowing, and malicious violations of the Stored Communications Act, 18 U.S.C. § 2701, *et seq.*, and the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq*., as well as breach of contract, tortious interference with business relations, conversion, and unfair and deceptive trade practices.

2.      In 2022, Allen sold his ownership interest in a financial advisory business, Balance Wealth Advisors, to BWA, owned by Leo White and Amy O'Connell, and began reaping the benefits thereof, receiving over $2 million to date as consideration. In late July 2024, in an act of commercial extortion, Allen attempted to extract additional payments from Ms. O'Connell and Mr. White, who have been exclusively running BWA for the past two-and-a-half years.

3.      This was unfortunately not out of character for Allen, who has a history of absconding on his taxes and child support and stealing from his business partners.

4.      Specifically, Allen refused to turn over the login credentials and passwords for certain business accounts, including for Balance Wealth Advisors' website, email, LinkedIn, and Google accounts, and others that had clearly been included in the 2022 sale of the business, unless Ms. O'Connell and Mr. White agreed to pay him even more money, over and above what they had already agreed to pay and Mr. Allen had agreed to accept.

5.      In an effort to exert additional pressure in support of this extortionate scheme, on July 30, 2024, Allen used his unauthorized access to BWA's GoDaddy account, which hosts and maintains BWA's website and business email accounts, to cut off the authorized users' access thereto, thereby disabling the business's website and email system and bringing the business to an abrupt and chaotic halt.

6.       BWA was left with no way to send or receive emails to or from its clients, execute on client directives, or market to new clients during a volatile market cycle.

7.      Upon information and belief, Allen also did this so that his new company, PFA, could unfairly compete with BWA and poach BWA's clients while BWA was unable to operate.

8.      Allen has since attempted through subterfuge to gain unauthorized access to BWA's customer relationship management ("CRM") system, which includes confidential data concerning all of BWA's clients.

9.      He has likewise begun falsely representing himself to the market as being an owner and representative of BWA on BWA's Google and LinkedIn pages that he has also taken unauthorized control over.

10.     BWA brings this action to redress and enjoin Defendants' unlawful hijacking and extortion of BWA's business. Defendants' willful, knowing, and malicious actions are disrupting BWA's business activities and have caused and will continue to cause BWA irreparable and unquantifiable damages as BWA cannot ensure its ability to maintain communication with its clients, market to potential new clients, or maintain its reputation in the market. BWA seeks to prevent Defendants' further disruption of BWA's business, enforce Allen's contractual obligations, protect BWA's client goodwill, reputation, and sensitive and confidential trade secret business information, and to prevent further or potential regulatory consequences.

## PARTIES

7.      BWA is a limited liability company organized under the laws of the Commonwealth of Massachusetts with its principal place of business located at 57 River Street Suite 300, Wellesley, Massachusetts 02481.

8.      Upon information and belief, David Allen resides in the State of Rhode Island and receives mail at 559 S. Water Street, Providence, Rhode Island 02903.

9.      BWA Wellesley LLC is a dissolved limited liability company organized under the laws of the Commonwealth of Massachusetts with its principal place of business formerly located at 57 River Street Suite 300, Wellesley, Massachusetts 02481. Allen was the sole owner of BWA Wellesley LLC.

10.     Providence Financial Advisors, LLC is a limited liability company organized under the laws of the State of Rhode Island with its principal place of business located at 559 S. Water Street, Providence, Rhode Island 02903. Upon information and belief, Allen is the sole owner of Providence Financial Advisors, LLC.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the matter arises out of federal law.

12.    This Court has supplemental jurisdiction over BWA's state law claims as these claims are part of the same case or controversy that forms the basis of BWA's federal law claim.

13.    This Court has personal jurisdiction over the defendant because, among other things, Allen regularly transacts business in this judicial District.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims in this action occurred within this District and Allen regularly transacts business in this District.

## FACTS

### I.    Allen's Involvement and Sale of BWA

15.    In or about 2014, Allen formed Balance Wealth Advisors in Wellesley, Massachusetts, as a financial services company that, among other things, provides personalized financial advisory services, financial consulting, retirement planning, risk assessment, insurance sales, and custom investment strategies.

16.    To facilitate the business operations of Balance Wealth Advisors, it acquired domain names for "Balance Wealth Advisor," "Balance Wealth Advisors," and "BWA," as well as related email accounts and a business phone number.

17.    Each manager and other employee of Balance Wealth Advisors had their own professional email account and used these email accounts to communicate with clients and store email correspondence to and from clients regarding financial matters (the "BWA Email Accounts"). Email correspondence is the most commonly used medium clients rely on for corresponding with their Balance Wealth Advisors advisor.

18.     Until approximately 2020, Allen was licensed to work in the financial services industry as a registered representative and Investment Advisor Representative.

19.     Allen initially affiliated Balance Wealth Advisors with LPL Financial as its broker-dealer, whereby LPL Financial maintained Allen's registration and provided various other services in support of BWA's business.

20.     On or about December 10, 2020, however, Allen's license to work in the financial services industry was revoked for failing to comply with policies, regulations, and his Heightened Supervision Plan established as a result of Allen's repeated violations of FINRA rules and failure to report various debts including an IRS Tax Lien of approximately $593,000.00, a Massachusetts Department of Revenue Lien of approximately $198,000.00, unpaid child support payments exceeding $167,000.00, and unpaid property settlement payments exceeding $1,700,000.00.

21.     Allen's Massachusetts license has not been reinstated since its termination in December 2020.

22.     After losing his license to perform investment advisory services, Allen agreed to sell his ownership interest in Balance Wealth Advisors to Leo White and Amy O'Connell.

23.     On January 19, 2021, a new legal entity was formed to facilitate the transaction and take 100% ownership of the Balance Wealth Advisors business, BWA LWP LLC.

24.     On April 13, 2021, a certificate of amendment was filed, correcting the name of the new entity to "BWA LPW LLC"—*i.e.*, Plaintiff BWA.

25.     BWA's Operating Agreement, dated January 19, 2021, shows that Leo White, as Original Member, was originally entitled to 50% of the allocation of the LLC's profits and distributions, while David Allen was entitled to the remaining 50% of the allocation.

26.     On March 1, 2022, Allen, on behalf of his wholly owned and controlled entity BWA Wellesley LLC,[1] through which he held his ownership interest in BWA, entered into the Purchase and Sale Agreement (the "Purchase Agreement") and executed a Bill of Sale and Assignment, security agreement, and promissory note with Mr. White and Ms. O'Connell at which time the deal closed and Allen transferred his interest in the business to Mr. White and Ms. O'Connell via BWA.

27.     Ms. O'Connell and Mr. White serve as the sole managers of BWA.

28.     All parties intended this transaction to reflect Allen's present transfer of his ownership stake in Balance Wealth Advisors and all related tangible and intangible assets and accounts, including any GoDaddy accounts that control the website and email domains currently and/or previously utilized by BWA, LinkedIn, Google, eFax, Redtail Technologies and other web-based, cloud-based, or electronic accounts utilized by BWA (the "BWA Accounts") to BWA.

29.     Allen, with and through counsel, prepared all drafts of the transaction documents.

30.     As reflected in the Purchase Agreement and Bill of Sale, BWA acquired all of Allen's interest in the Balance Wealth Advisors business in exchange for paying Allen $2.9 million, to be paid in monthly installments of no less than $20,000 until paid in full.

31.     Included in what BWA purchased from Allen were, of course, all tangible and intangible assets, including domain names, telephone numbers, digital assets and accounts, email addresses (including the BWA Email Accounts), the BWA Accounts, trademarks, goodwill, and customer and supplier lists, and trade secret information.

---

[1] BWA Wellesley LLC's original Certificate of Organization was filed on April 13, 2021, and Allen executed the certificate of Cancellation on December 30, 2022. As a result, BWA Wellesley LLC is no longer a going concern as far as the Commonwealth of Massachusetts is concerned.

32.     All BWA clients were transferred and put under Mr. White's advisor license number.

33.     On May 25, 2022, the Operating Agreement of BWA was amended to reflect that Leo White, as Original Member, was thereafter entitled to 100% of the allocation of the LLC's profits and losses, and that Allen was no longer involved in BWA's business as of May 2022.

34.     BWA began paying Allen monthly installment payments of approximately $30,000.00 per month, plus interest, more than contractually required.

35.     To date, BWA has paid Allen more than $2 million under the Purchase Agreement.

36.     On November 3, 2022, the parties executed a Modification to the Purchase Agreement, under which the parties could revisit the terms of Purchase Agreement and Allen's sale of his interest in Balance Wealth Advisors in the event that certain contingency conditions were satisfied and expressly stated that "[t]he Original Agreement is still in full force in effect (sic) with respect to all terms not expressly superseded herein.

37.     These contingencies were: (i) Allen becoming fully relicensed as a financial advisor in Massachusetts and (ii) Allen establishing a formal affiliation with Cadaret Grant & Co. ("Cadaret Grant") in a financial advisory capacity ("Contingency Conditions").

38.     Cadaret Grant served as BWA's broker-dealer and Allen's affiliation with Cadaret Grant, along with a license to practice in Massachusetts, were indispensable for Allen resuming activity on behalf of Balance Wealth Advisors.

39.     Per the Modification Agreement, if and when these Contingency Conditions were satisfied, and only then, Allen, by and through BWA Wellesley LLC, could identify assets that were originally included and transferred from Allen to BWA per the Purchase Agreement and require BWA to transfer them back to Allen ("Retained Assets").

40.     Various tangible and intangible assets were eligible to become Retained Assets in the event the Contingency Conditions were satisfied, including the company's domain name, digital assets and accounts, email addresses, goodwill, and lists of customers and suppliers.

41.     In the event the Contingency Conditions were satisfied, Allen was to identify Retained Assets in writing and any Retained Assets were to be transferred back to Allen.

42.     If Retained Assets were transferred back to Allen, the parties would reevaluate and adjust downward the previously agreed purchase price of $2.9 million as stated the Purchase Agreement to reflect the value of the Retained Assets.

43.     If Allen were relicensed as a financial advisor in Massachusetts and established a formal affiliation with Cadaret Grant, then he could effectively choose to unwind the Purchase Agreement and repurchase what he had sold to BWA in 2022.

44.     Further, notwithstanding the Contingency Conditions, the parties agreed in the Modification Agreement to set the applicable interest rate for the installment payments Allen had been receiving since the Purchase Agreement had been executed.

45.     The Contingency Conditions were never satisfied.

46.     As a result, Allen was not entitled to and did not identify any Retained Assets to transfer back to him from the original consummated transaction that was governed by the Purchase Agreement.

47.     The Balance Wealth Advisor business thus remains wholly owned by BWA (namely, Mr. White and Ms. O'Connell) and they are the only authorized representatives of the business.[2]

---

[2] Due to a confidentiality clause restricting disclosure of the Purchase Agreement, Plaintiff is requesting permission file the Purchase Agreement and Modification to Purchase and Sale Agreement under seal as **Exhibit A** and **Exhibit B**, respectively.

II.     **Allen Fails to Perform Under the Purchase Agreement**

48.     In the months that followed, the parties' once-collegial relationship spiraled out of control due to Allen's erratic behavior.

49.     On December 21, 2023, Cadaret Grant confirmed that they were not reestablishing their affiliation with Allen.

50.     In January 2024, Cadaret Grant again confirmed that it would not engage in a formal affiliation with Allen because Allen had not become fully relicensed as a financial advisor in Massachusetts.

51.     As a result of Allen's unlicensed status, Cadaret Grant required BWA to agree that Allen could not be affiliated with BWA in any way, could not have access to BWA clients, and could not access BWA's business information.

52.     Despite the facts that: (1) Allen sold all of his ownership interest in the Balance Wealth Advisors business and related assets to BWA (Mr. White and Ms. O'Connell) in 2022; (2) the 2022 transaction has remained in place as the Contingency Conditions of the Modification Agreement have not been satisfied; (3) the parties have not entered into any other agreements whereby Allen reacquired ownership in Balance Wealth Advisors or its assets; (4) Allen was not and is still not licensed as a financial advisor in Massachusetts; and (5) Allen was not and is still not reinstated by or affiliated with BWA's broker-dealer Cadaret Grant, Allen has refused to turn over certain assets and information that he sold to BWA in the 2022 transaction pursuant to the Purchase Agreement.

53.     For example, Allen has wrongfully retained BWA's account information which BWA needs to conduct its business, including access to the company's domains (serviced and maintained by GoDaddy Inc.), the BWA Email Accounts, BWA Accounts, business phone

numbers, and all usernames and passwords required to access, use, maintain, and service these accounts.

54.     Allen has continued participating in networking groups identifying himself as a licensed advisor and owner of Balance Wealth Advisors despite the fact that he is not licensed and no longer affiliated with Balance Wealth Advisors. He also recently updated his LinkedIn and Facebook accounts to falsely identify himself as a co-owner of Balance Wealth Advisors.

55.     On or about January 18, 2024, without BWA's authorization, Allen renewed the domain name with GoDaddy Inc., changed the login information and password but did not disclose the new login information or password to BWA.

56.     As a result of Allen having changed the login credentials, Mr. White, Ms. O'Connell, and BWA's third-party Information Technology ("IT") vendor, Magna5, could no longer access BWA's GoDaddy account or manage BWA's email Domain Name Server for service, renewals, and the like, functions that Magna5 had previously been performing for BWA.

57.     Per the terms of the Purchase Agreement, as modified, the Contingency Conditions have not been satisfied, and Allen has no basis for removing any assets from the transaction whereby he sold his interest in Balance Wealth Advisors along with all assets and accounts, including but not limited to the BWA Email Accounts.

58.     To date, Allen has refused to turn over company assets to BWA, including control of the BWA Email Accounts, website domains, and BWA accounts with Google, and LinkedIn in violation of his obligations under the Purchase Agreement.

## III.    Allen's Misconduct Escalates

59.     On or about March 28, 2024, Allen accessed Ms. O'Connell's personal bank account and a BWA account, neither of which he had authorization to access or draw from, and diverted approximately $5,000 of Ms. O'Connell's personal funds and $5,000 of BWA funds to

pay his own personal expenses he had charged to a BWA-issued company credit card that he did not have authorization to use.

60.     Despite repeated demands for return of these funds, Allen has refused to reimburse BWA for his theft of these funds.

61.     Fed up with his ongoing misconduct, although feeling sympathetic for the many personal issues Allen had created for himself, Mr. White and Ms. O'Connell attempted to negotiate an amicable resolution that would, finally, secure control of BWA's rightful properties, accounts, and credentials, including access to website and the BWA Email Accounts.

62.     Instead of negotiating in good faith, however, Allen proposed throwing out the original 2022 transaction and Purchase Agreement and demanded a new agreement with a different purchase price and additional payments, despite the fact that BWA had already paid Allen more than $2 million pursuant to the Purchase Agreement and the fact that he was already contractually required to turn over the assets he was holding hostage.

63.     On or about February 8, 2024 and again on or about July 25, 2024, the parties met in mediation sessions to discuss a potential resolution, but following the July 25, 2024 session, Allen left without signing the term sheet Mr. White and Ms. O'Connell believed the parties had agreed upon, claiming that he needed to think further about it and would respond by Monday, July 29, 2024. We

64.     Allen did not respond on Monday, July 29, 2024.

65.     Instead, on July 30, 2024, at approximately 1:40 pm EST, current BWA managers, including Mr. White and Ms. O'Connell, discovered that BWA's website was deactivated and they were unable to access their BWA Email Accounts.

66.     It has since been discovered that Allen intentionally deleted code on the backend of BWA's GoDaddy account, which disabled BWA's website and Email Accounts, including the professional email accounts of both Mr. White and Ms. O'Connell, among others, and prevented BWA from receiving incoming email communications from BWA clients or accessing stored email communications.

67.     The interruption effectively shut down BWA's business for all intents and purposes for several days until the undersigned were finally able to get the issue resolved through Allen's counsel after days of pleading that Allen reactivate the website and BWA Email Accounts.

68.     At no point did Mr. White, Ms. O'Connell, or any other BWA representative authorize Allen to control or access their BWA Email Accounts, website, or any other accounts.

69.     At no point Allen request permission to access the BWA Email Accounts, website, or any other accounts.

70.     The BWA Email Accounts, website, and other accounts Allen has hijacked are exclusively owned by BWA.

71.     BWA, Mr. White, Ms. O'Connell, and current BWA employees are the only authorized users of the BWA Email Accounts, website, and other accounts.

72.     As of July 30, 2024, Allen had no ownership or other interest or right to access any of BWA's accounts or properties, including but not limited to BWA's physical office, BWA's domains and/or websites, including the BWA Accounts and BWA Email Accounts.

73.     On July 30, 2024, undersigned counsel sent a cease-and-desist letter to counsel who had been representing Allen in ongoing negotiations with BWA.

74.     On the morning of July 31, 2024, undersigned counsel was contacted by different counsel for Allen, confirming receipt of the July 30, 2024 letter.

75.     On or about July 31, 2024, Allen created a new email account at FactBWA@gmail.com and has since attempted to reroute BWA's eFax account to his control. BWA can only assume these were done for nefarious purposes.

76.     On the afternoon of July 31, 2024, Allen modified the Balance Wealth Advisor Google page to replace BWA's name and contact information with that of PFA, a financial advisory business Allen owns and operates and, upon information and belief, is unlicensed.[3]

77.     On July 31, 2024, PFA received approximately 25 new "customer" reviews and comments on its Google page. Upon information and belief, the reviews were not provided by customers but were provided by employees of Allen's close friend, Jason Mickool, President of Florida Financial Advisors, who, also upon information and belief, is providing financial backing to Allen.[4]

78.     Many of the July 31, 2024 reviews reference a Zoom call that Allen apparently held the morning of July 31, 2024, during which he apparently gave a presentation and falsely represented the he owns and operates Balance Wealth Advisors.

79.     On the evening of July 31, 2024, the BWA website had been reactivated, however, the Google.com "website" feature still does not direct users to the BWA webpage.

80.     On the evening of July 31, 2024, Allen represented, through counsel, that the BWA Email Accounts had been reactivated.

81.     BWA employees were momentarily able to access the BWA Email Accounts, they quickly became inaccessible and the BWA Email Accounts were not accessible again to BWA

---

[3] Upon searching for "Balance Wealth Advisor" using the Google Search Engine, selecting the "Website" prompt directs a user to "www.nextinvestor.com/nxi/welcome," which is the same website reached when accessing the website for Providence Financial Advisors.

[4] BWA reserves all rights, including the right to amend the complaint to add Mr. Mickool and/or Florida Financial Advisors should it be established that they conspired with and/or aided and abetted Allen.

until after 4:30 pm on Friday, August 2, 2024, and were not completely restored to their fully-operational status until Tuesday, August 6, 2024, and BWA could not confirm access had been restored until Wednesday, August 7, 2024.

82.    Although BWA's access to its Emails Accounts has been restored for the time being, BWA has no means of ensuring that Allen will not disable the BWA Email Accounts again or take further action to extort or sabotage BWA's business and client relationships because he continues to have exclusive access to BWA's GoDaddy account, which he and his lawyers have both abjectly refused to turn over, or even provide joint access, to BWA such that it can ensure the continuation of its business.

83.    BWA has no means of verifying whether BWA has received all client communications attempted during the time when Allen disabled BWA's Email Accounts without access to the GoDaddy account.

84.    On August 8, 2024, BWA learned that on July 29, 2024, Allen contacted BWA's CRM vendor, Redtail Technology, and attempted to have control of BWA's CRM database transferred to him without BWA's knowledge or authorization. BWA's CRM database houses BWA's clients' personal information and client notes—all of which Allen had sold to BWA in 2022. Thus, had he been successful, Allen would have obtained illegal and unauthorized access to BWA's confidential and trade secret information and could have begun attempting to poach BWA's customers (which BWA knows is Allen's intent because his lawyer keeps raising the fact that he does not have a noncompete or non-solicitation agreement despite BWA never having raised that issue) and now claims ownership of BWA. BWA has serious concerns that, without court intervention, Allen will take further steps to sabotage BWA's business, including, without limitation, further interfering with its use and access to its website and Email Accounts.

## COUNT I
**(Unlawful Access to Stored Communications
in Violation of 18 U.S.C. §§ 2701, *et seq.*)
(Against Allen)**

85.     BWA restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

86.     Allen knowingly and intentionally accessed, without authorization, or at the very least in excess of any authorized access, a facility through which BWA's electronic communications are provided and thereby obtained access to such electronic communications while they were in storage in violation of 18 U.S.C. § 2701(a).

87.     Allen knowingly and intentionally prevented the authorized users and owners of the BWA Email Accounts from accessing or using the electronic communications stored in the BWA Email Accounts in violation of 18 U.S.C. § 2701(a).

88.     Allen continues to prevent authorized access to the BWA Email Accounts by withholding account and password information required to access and control the BWA Email Accounts by authorized users, despite relinquishing ownership, control, and or any authority to access the BWA Email Accounts when he sold BWA in 2022.

89.     As a direct and proximate result of Allen's violation of 18 U.S.C. §§ 2701, *et seq.*, BWA has suffered irreparable harm in the form of damage to its reputation, loss of goodwill, exposure to potential regulatory ramifications, as well as monetary damages in an amount to be determined at trial.

90.     BWA seeks an order compelling Allen to: (1) transfer all account and password information required to access the BWA domains, BWA Email Accounts, and all other accounts associated with BWA; (2) refrain from accessing the BWA domains, BWA Email Accounts, and

all other accounts associated with BWA; (3) refrain from preventing authorized access of BWA to its Email Accounts, domains, and all other accounts or assets.

### COUNT II
### (Violation of Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq.*)
### (Against Allen)

91.     BWA restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

92.     BWA derives independent economic value and business advantage by having exclusive use of its trade secret information, including but not limited to client names, nonpublic contact information, investment history and preferences, and other confidential financial information that BWA has expended significant resources collecting. The value of BWA's trade secret information was reflected, in part, by the price BWA paid Allen to acquire all of BWA's client list among all of BWA's tangible and intangible assets.

93.     BWA's trade secret information is not generally known to the public, and not readily ascertainable by proper means.

94.     BWA makes reasonable efforts to maintain the secrecy of its trade secret information by restricting access only to those within BWA with a need to use the information for BWA's business, who owe duties to clients to maintain confidentiality, and housing the data in a secure database with restricted access.

95.     BWA complies with government regulations concerning the secrecy and protection of advisory clients' confidential and personal information.

96.     BWA uses and intends to use its trade secret information in interstate commerce.

97.     Allen continues to exercise control over BWA's assets by withholding credentials needed for BWA to access its website, BWA Email Accounts, and other accounts.

98.     On or about Monday, July 29, 2024, Allen attempted to misappropriate BWA's trade secret information by contacting the CRM vendor hosting BWA's client information and sought improper and unauthorized access to BWA's trade secret information under false pretenses of claiming he owned BWA.

99.     Allen's conduct of accessing or seeking unauthorized access to BWA's trade secret information constitutes actual or attempted or threatened misappropriation of BWA's trade secrets.

100.    Allen knew he did not have authority to access BWA's trade secret information and did so, upon information and belief to further his extortionate scheme at BWA's expense.

101.    As a direct and proximate result of Allen's conduct, BWA risks suffering irreparable harm in the form of damage to its reputation, loss of goodwill, exposure to potential regulatory ramifications, as well as monetary damages in an amount to be determined at trial.

102.    BWA is entitled to injunctive relief to prevent Allen's further attempts to misappropriate BWA's trade secret information.

<u>**COUNT III**</u>
**(Breach of Contract)**
**(Against Allen and BWA Wellesley LLC)**

103.    BWA restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

104.    Allen, via BWA Wellesley LLC, entered into the Purchase Agreement and Bill of Sale with BWA in 2022 in which Allen transferred ownership of his interest in Balance Wealth Advisors to BWA, including all tangible and intangible assets, Balance Wealth Advisors' domain names, digital assets and accounts, email addresses, goodwill, and lists of customers and suppliers.

105.    The Purchase Agreement and Bill of Sale are valid, binding, and enforceable contracts between BWA and Allen via BWA Wellesley LLC.

106.    BWA performed its obligations under the Purchase Agreement and Bill of Sale, including paying Allen installments with interest totaling more than $2 million to date.

107.    At all relevant times beginning March 1, 2022, Allen and BWA Wellesley LLC have been, and continue to be, bound by the terms of the Purchase Agreement and Bill of Sale, specifically the obligation to transfer and relinquish control of BWA domains, BWA Email Accounts, other online accounts, and all BWA assets and or property.

108.    Allen and BWA Wellesley LLC materially breached the Purchase Agreement and Bill of Sale immediately upon execution by failing to provide BWA with login credentials or passwords necessary for accessing its business website account and BWA Email Accounts and have continued to do so through Allen's continued control and access to BWA's account information despite transferring ownership in 2022.

109.    Allen further materially and willfully breached the Purchase Agreement and Bill of Sale by disabling the BWA website and BWA Email Accounts, accessing and controlling the BWA Email Accounts, preventing BWA owners, managers, and employees from accessing the BWA Email Accounts, interfering with BWA's relationships with its customers and employees by preventing email communication or access to the company's website and accessing BWA's confidential business information.

110.    Allen's and BWA Wellesley LLC's breaches were willful, intentional, and malicious and for the purpose of extracting additional payment from BWA to which Allen and BWA Wellesley LLC were not entitled to receive.

111.    As a direct and proximate result of Allen's and BWA Wellesley LLC's breaches, BWA has suffered irreparable harm in the form of damage to its reputation, loss of goodwill,

exposure to potential regulatory ramifications, as well as monetary damages in an amount to be determined at trial.

112.    Allen and BWA Wellesley LLC have breached the Purchase Agreement and Bill of Sale and threaten further breaches of the Purchase Agreement and Bill of Sale if allowed to continue.

113.    BWA seeks an order compelling Allen to specifically perform his obligations under the Purchase Agreement and Bill of Sale, including but not limited to transferring all assets, including account and password information, required for BWA to access its domains, BWA Email Accounts, and all other accounts or property associated with Balance Wealth Advisors.

**COUNT IV**
**(Tortious Interference with Advantageous Business Relations)**
**(Against all Defendants)**

114.    BWA restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

115.    At all material times, BWA had a reasonable expectation of advantageous business relations with its existing and potential customers, including potential customers who may attempt to contact BWA using its website or via the BWA Email Accounts.

116.    At all material times, BWA had a reasonable expectation that Allen would abide by all terms of the Purchase Agreement and Bill of Sale and in exchange the sum of money he was receiving from BWA, including installment payments on a monthly basis, he would relinquish control of all assets that he had transferred ownership to BWA, including domain names, BWA Email Accounts, other electronic accounts, customer lists, the business phone number, and other tangible and intangible property.

117.    At all material times, BWA relied on access to its website and BWA Email Accounts to conduct business with new and prospective clients, partnering businesses, and government regulators.

118.    At all material times, Defendants had actual knowledge and notice of BWA's foregoing reasonable expectation of economic advantage, for example, Defendants knew that BWA communicated with new and existing clients through the BWA Email Accounts and phone numbers and attracted new potential clients via its website.

119.    On or about July 31, 2024, Allen changed BWA's website and Google links to direct potential customers to his own unlicensed business, Providence Financial Advisors.

120.    By disabling BWA's website without warning, taking over access to BWA's professional email accounts without authorization and in violation of federal law, and clandestinely diverting BWA existing and prospective BWA clients to PFA's website, Defendants used improper means to interfere with BWA's actual and prospective advantageous business relations.

121.    As a direct result of Allen's interference, BWA's actual and prospective business relationships and contracts have been damaged or destroyed, as the time BWA was cut off from communicating with new and prospective clients has and will damage its client relationships, reputation, and goodwill.

122.    As a direct and proximate result of Defendants' conduct, BWA has suffered irreparable harm in the form of damage to its reputation, loss of goodwill, exposure to potential regulatory ramifications, as well as monetary damages in an amount to be determined at trial.

**COUNT V**
**(Violation of M. G. L. C. 93A, §§ 2, 11)**
**(Against all Defendants)**

123.    BWA restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

124.    BWA is a "person" and engages in "trade or commerce" within the meaning of M. G. L. c. 93A, §1.

125.    Defendants are each a "person" and engaged in "trade or commerce" within the meaning of M. G. L. c. 93A, §1.

126.    The actions of Defendants as set forth above constitute willful and knowing violations of M. G. L. c. 93A, §11, and they have occurred primarily and substantially within Massachusetts.

127.    Defendants' wrongful practices include, without limitation, converting BWA's website and email accounts for their own use, cutting off BWA's ability to communicate with clients and business partners, with Allen holding himself out as owner and representative of Balance Wealth Advisors despite selling his interest in the company and relinquishing rights to its assets in 2022, diverting new and existing customers from BWA to his unlicensed entity, Providence Financial Advisors, and attempting to misappropriate its confidential and trade secret information housed in its CRM database.

128.    Allen's malicious disabling of BWA's website and BWA Email Accounts, cutting off BWA's rightful owners from their business and clients and refusing to hand over the login credentials without additional payments above and beyond what BWA had already agreed to pay for them in the Purchase Agreement, is an act of commercial extortion whereby Allen is attempting to extract additional payment from the purchasers of Balance Wealth Advisors despite agreeing to

sell his ownership interest in the business and all associated assets and accounts more than two years ago and receiving over $2 million in consideration for that transaction.

129.    Upon information and belief, Defendants' conduct is intended to provide PFA with an unfair competitive advantage such that PFA can capitalize on BWA's damaged reputation and inability to operate its business, circumstances Allen caused, to improperly poach BWA's clients.

130.    As a direct and proximate result of Defendants' conduct, BWA has suffered irreparable harm in the form of damage to its reputation, loss of goodwill, exposure to potential regulatory ramifications, as well as monetary damages in an amount to be determined at trial.

**COUNT VI**
**(Conversion)**
**(Against Allen)**

131.    BWA restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

132.    At all relevant times, BWA was the owner with the right to possession of, and was and still is entitled to possession of, the control and access of the BWA Email Accounts, domains, websites, Redtail, LinkedIn, and Facebook accounts associated with the Balance Wealth Advisors business.

133.    On or about March 28, 2024, Allen accessed Ms. O'Connell's personal bank account and a BWA account, neither of which he had authorization to access or draw from, and without authorization, Allen diverted approximately $5,000 of Ms. O'Connell's personal funds and of $5,000 of BWA funds to pay his own personal expenses he had charged to a BWA-issued company credit card.

134.    On or about July 30, 2024, Allen and PFA converted BWA's website, BWA Email Accounts, and other electronic accounts by willfully and with conscious disregard for BWA's

rights, deactivating the BWA website and preventing authorized users from accessing the BWA Email Accounts.

135.    Allen continues to exercise control over BWA's assets by withholding credentials needed for BWA to access its website, BWA Email Accounts, and other accounts.

136.    As a direct and proximate a result of Allen's and PFA's conversion, BWA is entitled to recover the value of its website and BWA Email Accounts and fair compensation for the time and money expended to recover these assets.

**COUNT VII**
**Declaratory Judgment**
**(Against all Defendants)**

137.    BWA restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

138.    There is a substantial and justiciable controversy between BWA and Defendants as to the parties' rights concerning the ownership of the Balance Wealth Advisors business and all associated tangible and intangible assets.

139.    The parties' respective rights were set forth in the Purchase Agreement and Bill of Sale.

140.    Pursuant to the Purchase Agreement and Bill of Sale, David Allen, via his wholly owned and controlled entity BWA Wellesley LLC through which he held his ownership interest in BWA, transferred his interest in the business to Mr. White and Ms. O'Connell via BWA, including all tangible and intangible assets, domain names, telephone numbers, digital assets and accounts, email addresses (including the BWA Email Accounts), trademarks, goodwill, and customer and supplier lists.

141.   All parties intended this transaction to reflect Allen's present transfer of his ownership stake in Balance Wealth Advisors to BWA.

142.   BWA acquired all of Allen's interest in the Balance Wealth Advisors business in exchange for paying Allen $2.9 million.

143.   Notwithstanding this consummated transaction, Allen refuses to surrender all assets included in the transaction and continues representing that he owns the Balance Wealth Advisors business.

144.   BWA is therefore entitled to a declaratory judgment that the Purchase Agreement and Bill of Sale executed by the parties on or about March 1, 2022 transferred all ownership of the Balance Wealth Advisors business, including ownership of all tangible and intangible assets, domain names, telephone numbers, digital assets and accounts, email addresses (including the BWA Email Accounts), trademarks, goodwill, and customer and supplier lists to BWA and that BWA is the sole owner of the Balance Wealth Advisors business and all associated assets.

## PRAYER FOR RELIEF

WHEREFORE, BWA LPW LLC respectfully requests the following relief:

a) An order requiring Defendants to specifically perform pursuant to and comply with the terms of the Purchase Agreement and relinquish all assets transferred to BWA under the terms of the Purchase Agreement;

b) Compensatory, exemplary, and punitive damages in amounts to be proved at trial;

c) Declaratory judgment that BWA LPW LLC is the sole owner of the Balance Wealth Advisors business and all associated assets;

d) Preliminary and permanent injunctive relief:

  i. Compelling Defendants to disclose and surrender to BWA exclusive control over all usernames and passwords for the BWA Accounts (defined as any GoDaddy account(s) that controls the website and email domains currently and/or previously utilized by BWA, as well as any LinkedIn, Google, eFax, Redtail Technologies and other web-based, cloud-based, or electronic accounts currently and/or previously utilized by BWA);

  ii. Enjoining Defendants and those acting in concert with them from controlling, accessing, modifying, or restricting BWA's access to, or

attempting to control, access, modify, or restrict BWA's access to, the BWA Accounts;

    iii.    Enjoining Defendants and those acting in concert with them from accessing, using, retaining, or disclosing, or attempting to access, use, retain, or disclose BWA's confidential information and trade secrets, including without limitation client information contained in any CRM database currently and/ or previously utilized by BWA or otherwise;

    iv.    Enjoining Defendants and those acting in concert with them from entering Plaintiff BWA LPW LLC's place of business located at 57 River Street Suite 300, Wellesley, Massachusetts 02481, or attending any BWA-sponsored events; and

    v.    Enjoining David H. Allen from identifying himself as owner or affiliate of Balance Wealth Advisors.

e)   Multiple damages to BWA pursuant Mass. Gen. L. c. 93A;

f)   Statutory, exemplary, and punitive damages to BWA pursuant to 18 U.S.C. §§ 2701, *et seq.* and 18 U.S.C. § 1836(b)(3)(B);

g)   Attorneys' fees in accordance with Section 14 of the Purchase Agreement, Mass. Gen. L. c. 93A, 18 U.S.C. § 2701, *et seq.* and 18 U.S.C. § 1836(b)(3)(B);

h)   Costs and expenses otherwise recoverable under the law;

i)   Pre-and post-judgment interest at the highest legal rate; and

j)   Any other relief as deemed to be warranted by this Court.

    Respectfully,

    BWA LPW LLC,

    */s/ Erik W. Weibust*
    Erik W. Weibust (BBO # 663270)
    Adam R.D. Paine (BBO # 697246)
    Epstein Becker & Green, P.C.
    125 High Street, Suite 2114
    Boston, Massachusetts 02110
    Tel: (617) 603-1100
    eweibust@ebglaw.com
    apaine@ebglaw.com

Dated August 12, 2024                 *Attorneys for Plaintiff BWA LPW LLC*

## **VERIFICATION**

I, Amy O'Connell, hereby verify and certify under 28 U.S.C. §1746 as follows:

1.      I am the Chief Operating Officer of Balance Wealth Advisors.

2.      I have read the foregoing Verified Complaint and I verify, based on my personal knowledge and the records and information maintained by BWA LPW LLC, d/b/a Balance Wealth Advisors to which I have access, that the facts stated in the Verified Complaint are true.

I certify under penalty of perjury that the foregoing is true and correct.



_____
                                        Amy O'Connell

Dated:  August 12, 2024