## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BWA LPW LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. |
| | ) | |
| DAVID H. ALLEN, | ) | |
| BWA WELLESLEY LLC, and | ) | **JURY TRIAL DEMANDED** |
| PROVIDENCE FINANCIAL | ) | |
| ADVISORS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF BWA'S
## MOTIONS FOR TRO AND PRELIMINARY INJUNCTION

In 2022, David Allen sold his ownership interest in a financial advisory business to Plaintiff BWA LPW LLC ("BWA"), and immediately began reaping the benefits, receiving over $2 million to date. Nevertheless, in late 2023, Allen began attempting to extort additional payments from the buyers, who have been successfully running the business for the past two-and-a-half years, by refusing to turn over the login credentials and passwords for BWA's website, email accounts, LinkedIn account, and Google account, all of which were expressly included in the 2022 sale for which Allen received millions of dollars in consideration, unless the buyers paid him additional six-figure amounts.

Apparently hoping to ramp up the pressure to accomplish his extortionate scheme, on July 30, 2024, without warning or authorization, Allen accessed BWA's GoDaddy account, on which BWA maintained its business email accounts and website, the lifeblood of a small business like BWA, and cut off BWA's access thereto, bringing BWA's business to an abrupt and chaotic halt such that they could not communicate with clients in a highly volatile market cycle. Despite

1

regaining access to the email accounts in bits and pieces over the next week, BWA cannot ensure its continued access to its email accounts and remains at Allen's mercy because he continues to exercise exclusive control over the login credentials. Indeed, Allen's affirmative misconduct is ongoing. Just over the past week alone, he has attempted to access BWA's customer relationship management ("CRM") database and its eFax account, both without authorization and in violation of federal law.

Specifically, as evidenced by the Verified Complaint ("Compl."), attested to by BWA's Chief Operating Officer, Amy O'Connell, Allen has violated the federal Stored Communications Act and Defend Trade Secrets Act, as well as state common law, and breached his contractual obligations by accessing without authorization and restricting authorized access to BWA's email accounts which serve as repositories of years' worth of client communications and facilitate the day-to-day operations of BWA's business. Allen further violated federal law by attempting to access BWA's CRM system, which serves as a repository of its confidential and trade secret information concerning its clients. Without control of its email accounts in a time of financial volatility and uncertainty, email accounts that Allen expressly sold his ownership interest in more than two years ago, BWA risks a repeat freeze and cut off from its clients, rendering BWA unable to operate its business and serve its clients' financial interests. And if Allen is successful at accessing its CRM database and other accounts, it is at risk of far more.

Without immediate intervention from this Court, Allen, who has demonstrated a wanton disrespect for his legal and ethical obligations in myriad ways in the past (including failing to pay taxes and child support, and stealing from his former business partners' bank accounts), will not hesitate to continue his unauthorized access and control of BWA email accounts, steal BWA out from under its rightful owners, abscond with the business as well as the $2.2 million he received

when he sold it, and use the chaotic situation that he alone has created to compete unfairly for BWA's clients on behalf of his newly formed company, Defendant Providence Financial Advisors, LLC ("PFA").

Allen wants all to believe that 2022 sale of the business, which was precipitated and necessitated by his own misconduct, never happened despite the plain and overwhelming evidence to the contrary. Specifically, in recent years, Allen has seen his license to practice in the financial advisory industry revoked, been subject to tax liens representing hundreds of thousands of dollars in unpaid income tax over the span of several years, fallen into arrears on child support payments exceeding $167,000, and owes unpaid property settlement payments exceeding $1.7 million. Unfortunately, extorting money from those who trust and rely on him does not appear out of character for Allen. This is just the latest example.

BWA therefore seeks a temporary restraining order and preliminary injunction: compelling David H. Allen, PFA, and BWA Wellesley LLC[1] (collectively "Defendants") to disclose and surrender to BWA exclusive control over all usernames and passwords for the BWA Accounts (defined as any GoDaddy account(s) that controls the website and email domains currently and/or previously utilized by BWA, as well as any LinkedIn, Google, eFax, Redtail Technologies and other web-based, cloud-based, or electronic accounts currently and/or previously utilized by BWA); enjoining Defendants and those acting in concert with them from controlling, accessing, modifying, or restricting BWA's access to, or attempting to control, access, modify, or restrict BWA's access to, the BWA Accounts; enjoining Defendants and those acting in concert with them from accessing, using, retaining, or disclosing, or attempting to access, use, retain, or disclose

---

[1] BWA Wellesley LLC is a dissolved limited liability company organized under the laws of the Commonwealth of Massachusetts, which Allen was the sole owner of. Allen executed the Purchase Agreement with BWA on behalf of his wholly owned LLC, BWA Wellesley LLC.

BWA's confidential information and trade secrets, including without limitation client information contained in any CRM database currently and/ or previously utilized by BWA or otherwise; enjoining Defendants and those acting in concert with them from entering Plaintiff BWA LPW LLC's place of business located at 57 River Street Suite 300, Wellesley, Massachusetts 02481, or attending any BWA-sponsored events; and enjoining David H. Allen from identifying himself as owner or affiliate of Balance Wealth Advisors.

Absent this narrow injunctive relief, BWA will suffer immediate irreparable harm in the form of lost customer goodwill, harm to its reputation, and potentially regulatory issues resulting from its inability to communicate with its clients who may be providing instructions to BWA with regard to moving their hard-earned money.

## I.  RELEVANT FACTS

Allen formed "Balance Wealth Advisors" in Wellesley, Massachusetts, in 2014 to provide personalized financial advisory services, financial consulting, retirement planning, risk assessment, insurance sales, and custom investment strategies. Verified Complaint ("Compl.") at ¶ 15. To facilitate the business operations of Balance Wealth Advisors, Allen acquired domain names for "Balance Wealth Advisor," "Balance Wealth Advisors," and BWA, as well as related email accounts and a business phone number. Compl. at ¶ 16. Each employee of BWA had his or her own professional email account and used these email accounts to communicate with clients and store email correspondence to and from clients regarding the clients' financial advisory matters (the "BWA Email Accounts"). Compl. at ¶ 17.

Until approximately 2020, David Allen was licensed to work in the financial advisory industry as a registered representative and Investment Advisor Representative. Compl. at ¶ 18. On or about December 10, 2020, Allen's license to work in the financial advisory industry was

revoked for failing to comply with policies, regulations, and his Heightened Supervision Plan established as a result of his repeated violations of FINRA rules and failure to report various debts and legal violations. Compl. at ¶ 20. Allen's Massachusetts license has not been reinstated since its termination in December 2020. Compl. at ¶ 21.

After losing his license to perform investment advisory services, Allen agreed to sell his ownership interest in Balance Wealth Advisors to his colleagues, Leo White and Amy O'Connell. Compl. at ¶ 22. On March 1, 2022, Allen, via BWA Wellesley LLC, entered into the Purchase and Sale Agreement (the "Purchase Agreement") and executed a Bill of Sale and Assignment, security agreement, and promissory note with White and O'Connell, via BWA. Compl. at ¶ 26. As reflected in the Purchase Agreement and Bill of Sale, BWA acquired all of Allen's interest in the Balance Wealth Advisors business in exchange $2.9 million, to be paid in monthly installments of at least $20,000 until paid in full. Compl. at ¶ 30. Included in the sale were all tangible and intangible assets, including domain names, telephone numbers, digital assets and accounts, email addresses (including the BWA Email Accounts), trademarks, goodwill, and customer and supplier lists. Compl. at ¶ 31. BWA's Operating Agreement was amended to reflect that Allen was no longer involved in BWA's business as of May 2022. Compl. at ¶ 33. The transaction closed on March 1, 2022, when the Parties executed the Purchase Agreement and Bill of Sale and BWA began making payments thereunder. Compl. at ¶¶ 26. BWA began paying Allen monthly installment payments of approximately $30,000.00 per month, plus interest. Compl. at ¶ 34. To date, BWA has paid Allen more than $2 million under the Purchase Agreement in exchange for 100% ownership of the Balance Wealth Advisors business. Compl. at ¶ 35.

On November 3, 2022, the parties executed a Modification to the Purchase Agreement ("Modification Agreement"), acknowledging that the parties could revisit (and potentially reverse)

the terms of Purchase Agreement and Allen's sale of his interest in BWA in the event that certain contingency conditions were satisfied. Compl. at ¶ 36. ***The Modification Agreement expressly stated that "[t]he Original Agreement is still in full force in effect (sic) with respect to all terms not expressly superseded herein."*** *Id.* These contingencies were: (i) Allen becoming fully relicensed as a financial advisor in Massachusetts, and (ii) Allen establishing a formal affiliation with Cadaret Grant in a financial advisory capacity ("Contingency Conditions"). Compl. at ¶ 37. As noted above, Cadaret Grant served as BWA's broker-dealer and Allen's affiliation with Cadaret Grant, along with a license to practice in Massachusetts, were indispensable for Allen resuming activity on behalf of BWA. Compl. at ¶ 38.

Per the Modification Agreement, if and when these Contingency Conditions were satisfied, and only then, Allen, by and through BWA Wellesley LLC, could identify assets that were originally included and transferred from Allen to BWA per the Purchase Agreement and require BWA to transfer them back to Allen ("Retained Assets"). Compl. at ¶ 39. Various tangible and intangible assets were eligible to become Retained Assets in the event the Contingency Conditions were satisfied, including the company's domain name, digital assets and accounts, email addresses, goodwill, and lists of customers and suppliers. Compl. at ¶ 40. In the event the Contingency Conditions were satisfied, Allen was to identify Retained Assets in writing and any Retained Assets were to be transferred back to Allen. Compl. at ¶ 41. If Retained Assets were transferred back to Allen, the parties would reevaluate and adjust downward the previously agreed purchase price of $2,900,000 as stated the Purchase Agreement to reflect the value of the Retained Assets. Compl. at ¶ 42.

In other words, if Allen were relicensed as a financial advisor in Massachusetts and reestablished a formal affiliation with Cadaret Grant, then he could effectively choose to unwind

the Purchase Agreement and Bill of Sale and repurchase what he had sold to BWA in 2022. Compl. at ¶ 43. Further, notwithstanding the Contingency Conditions, the parties agreed in the Modification Agreement to set the applicable interest rate for the installment payments Allen had been receiving since the Purchase Agreement had been executed. Compl. at ¶ 44.

The Contingency Conditions were never satisfied. Compl. at ¶ 45. As a result, Allen was not entitled to (and did not) identify any Retained Assets to transfer back to him from the original consummated transaction that was governed by the Purchase Agreement. Compl. at ¶¶ 46-47. BWA thus continues to exclusively own all assets of the Balance Wealth Advisors business as reflected in the March 2022 Purchase Agreement and Bill of Sale. Compl. at ¶ 47. BWA thus remains wholly owned by Mr. White and Ms. O'Connell and they are the only authorized representatives of the business. Compl. at ¶ 47.

On or about January 18, 2024, Allen logged into BWA's GoDaddy account, changed the username and password, and renewed BWA's domain name with GoDaddy, but did not disclose the new account information or password to BWA, thereby locking BWA out of the account. Compl. at ¶¶ 55-56. Per the terms of the Purchase Agreement, Allen was required to turn over company assets to BWA, including control of the BWA Email Accounts, website domains, BWA accounts for its CRM database, Google accounts, and LinkedIn account. Compl. at ¶ 57. He did not do so, in violation of his obligations under the Purchase Agreement. Compl. at ¶ 58.

In an effort to avoid litigation and secure control of BWA's rightful properties, accounts, and login credentials, including access to BWA website and the BWA Email Accounts, BWA attempted to negotiate a resolution. Compl. at ¶ 61. Instead of negotiating in good faith, however, Allen proposed throwing out the original transaction and Purchase Agreement and demanded a new agreement with a different purchase price and additional payments, despite the fact that BWA

had already paid Allen more than $2 million pursuant to the Purchase Agreement. Compl. at ¶ 62. On or about July 25, 2024, the parties met to discuss a potential resolution, but Allen left without reaching an agreement, promising a final answer by Monday, July 29, 2024. Compl. at ¶ 63. He failed to do so. Compl. at ¶ 64.

Instead, on Tuesday, July 30, 2024, at approximately 1:40 pm EST, BWA's managers, including White and O'Connell, discovered that the BWA website had been deactivated and they were not able to access their BWA Email Accounts. Compl. at ¶ 65. Allen had used his credentials and disabled the BWA website and took over access to the BWA Email Accounts, including the professional email accounts of both White and O'Connell, among others, preventing authorized users from accessing their email accounts. Compl. at ¶ 66.

This interruption effectively shut down BWA's business for all intents and purposes for several days until BWA's counsel were finally able to get the issue resolved through Allen's counsel after days of pleading that Allen reactivate the website and BWA Email Accounts. Compl. at ¶ 67. At no point did White, O'Connell, or any other BWA employee authorize Allen to control, access, or disable their BWA Email Accounts. Compl. at ¶ 68. At no point did Allen request permission to do so. Compl. at ¶ 69. Nevertheless, beginning on or about July 30, 2024, Allen began accessing the BWA Email Accounts and preventing BWA employees from accessing those accounts, including the accounts of White and O'Connell. Compl. at ¶¶ 66-72. The BWA Email Accounts are owned exclusively by BWA. Compl. at ¶ 70. BWA, White, O'Connell, and current BWA employees are the only authorized users of the BWA Email Accounts. Compl. at ¶ 71. Allen had no ownership or other interest or right to access the BWA Email Accounts or BWA's other accounts or properties, including but not limited to BWA's physical office, BWA's domains and/or

websites, including BWA's accounts with GoDaddy, Redtail, eFax, LinkedIn, and Google as of July 30, 2024. Compl. at ¶ 72.

On the evening of July 31, 2024, Allen represented, through counsel, that the BWA Email Accounts had been reactivated. Compl. at ¶ 80. BWA employees were momentarily able to access the BWA Email Accounts, but they quickly became inaccessible and the BWA Email Accounts were not accessible again to BWA until after 4:30pm on Friday, August 2, 2024 and were not completely restored to their fully-operational status until Tuesday, August 6, 2024, though BWA could not confirm access had been restored until Wednesday, August 7, 2024. Compl. at ¶ 81.

Although BWA's access to its Emails Accounts has been restored for the time being, BWA has no means of ensuring that Allen will not disable the BWA Email Accounts again or take further action to extort or sabotage BWA's business and client relationships because he continues to have exclusive access to BWA's GoDaddy account, which he and his lawyers have both abjectly refused to turn over, or even provide joint access, to BWA such that it can ensure the continuation of its business. Compl. at ¶ 82. Moreover, BWA likewise has no means of verifying whether BWA has received all client communications attempted during the time when Allen disabled BWA's Email Accounts without access to the GoDaddy account. Compl. at ¶ 83.

Moreover, on August 8, 2024, BWA learned that, on July 29, 2024, Allen had contacted BWA's CRM vendor, Redtail Technology, and attempted to have control of BWA's CRM database transferred to him without BWA's knowledge or authorization. BWA's CRM database houses BWA's clients' personal information and client notes. Compl. at ¶ 84. Thus, had his attempt been successful, Allen would have obtained illegal and unauthorized access to BWA's confidential and trade secret information and could have begun attempting to poach BWA's customers (which BWA knows is Allen's intent because his lawyer keeps raising the fact that he does not have a

noncompete or non-solicitation agreement despite BWA never having raised that issue) and now claims ownership of BWA. *Id.* BWA has serious concerns that, without court intervention, Allen will take further steps to sabotage BWA's business, including, without limitation, further interfering with its use and access to its website and Email Accounts. *Id.* Enough is enough.

## II. LEGAL STANDARD

In deciding whether to grant injunctive relief, the Court considers: (1) the plaintiff's likelihood of success on the merits; (2) the likelihood of the plaintiff suffering irreparable harm if the injunction is withheld; (3) the balance of hardships; and (4) whether granting the injunction is in the public interest. *See Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013). The likelihood of success on the merits, "is the main bearing wall of the four-factor framework." *Id.* at 10 (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996)). A TRO is warranted if the harm the plaintiff faces is also immediate. *See* Fed. R. Civ. P. 65(b).

The Federal Rules of Civil Procedure provide that a district court may issue a TRO without notice to the adverse party or its attorney if: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required. Fed. R. Civ. P. 65(b)(1)(A), (B).

## III. ARGUMENT

### A. BWA Is Likely To Prevail On The Merits

#### 1. Claim for Unlawful Access to Stored Communications in Violation of 18 U.S.C. § 2701, *et seq.*

The Stored Communications Act, 18 U.S.C. § 2701, *et seq.* ("SCA"), prohibits an individual from (1) intentionally accessing a facility that provides an electronic communication

service without authorization or exceeding an authorization to access that facility and thereby (2) obtaining, altering or preventing authorized access to an electronic communication while it is in electronic storage in such a system. 18 U.S.C. § 2701(a). The SCA provides a private right of action to any "person aggrieved" by conduct that violates the SCA and that was performed with a knowing or intentional state of mind. 18 U.S.C. § 2707(a). An "aggrieved person" is a person who was a party to an intercepted electronic communication or against whom the interception was directed. 18 U.S.C. § 2711(1) (referring to § 2510(11)). The SCA also provides for criminal penalties where the offense is committed for purposes of commercial advantage, malicious destruction or damage, or private commercial gain, including a fine or imprisonment for not more than 5 years, or both. 18 U.S.C. § 2701(b)(1)(A).

Allen violated the SCA by intentionally accessing BWA's Email Accounts and preventing authorized access between July 30, 2024, and approximately August 6, 2024. BWA's Email Accounts contain stored emails from existing clients as well as incoming emails from new and prospective clients attempting to contact BWA. As evidenced by the Purchase Agreement and Bill of Sale, Allen had no ownership interest or authorization to access, specifically the accounts acquired by BWA, and had no authority to prevent Mr. White's and Ms. O'Connell's authorized access to their accounts. Compl. at ¶¶ 27, 30-31. This is precisely what the SCA is intended to prevent. *See Bernstein v. MyJoVE Corp.*, 97 Mass. App. Ct. 1127, 150 N.E.3d 1144 (2020) (affirming award of punitive damages for violation of SCA); *Google LLC v. Starovikov*, 2021 WL 6754263, at *2 (S.D.N.Y. Dec. 16, 2021) (entering preliminary injunction based in part on finding that plaintiff established a likelihood of success on the merits of its claim that defendants violated and continued violating 18 U.S.C. § 2701(a) which prohibits, intentionally accessing without authorization a facility through which an electronic communication service is provided to obtain,

alter, or prevent authorized access to a wire or electronic communication while it is in electronic storage); *see also Cerelux Ltd. v. Yue Shao*, 2017 WL 4769445, at *7 (C.D. Cal. May 3, 2017) (entering preliminary injunction to protect against defendant's hijacking of plaintiff's website and domain name after finding likelihood of success on the merits of these claims).

### 2. Claim for Attempted and Threatened Misappropriation Under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.*

BWA is also likely to succeed on the merits of its claim under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.* (DTSA) (Count II). To prevail on its claim under the DTSA, BWA must establish that (1) the information at issue constitutes a trade secret, (2) that BWA took reasonable measures to secure the confidentiality of the information, and (3) the defendant "used improper means," to actually or attempt to acquire or use the trade secret. *See e.g., Parexel Int'l LLC v. Signant Health Holding Corp.*, 2023 WL 2938073, *9 (D. Mass. Apr. 13, 2023); *G&L Plumbing, Inc. v. Kibbe*, 699 F. Supp. 3d 96, 105 (D. Mass. 2023) (finding plaintiff had established a likelihood of success on the merits on its trade secrets claim warranting preliminary injunction). To qualify as a trade secret, the information must be protected through reasonable means, that "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3)(B).

The evidence here clearly demonstrates actual and/or threatened misappropriation of BWA's trade secrets. BWA acquired the client list and associated database as part acquisition of the Balance Wealth Advisors business from Allen. Further BWA makes reasonable efforts to maintain the secrecy of its trade secret information by restricting access only to those within BWA with a need to use the information for BWA's business and housing the data in a secure database, as demonstrated by Allen's failed attempt to access the information without proper authority.

Moreover, BWA complies with government regulations concerning the secrecy and protection of advisory clients' confidential and personal information. Indeed, customer lists of this nature are regularly considered to constitute trade secrets. *See Parexel Int'l LLC v. Signant Health Holding Corp.*, 2023 WL 2938073, at *8 (D. Mass. Apr. 13, 2023) (noting customer lists and related information and account strategies regarding customers as potentially trade secret information); *Allstate Ins. Co. v. Fougere*, 2019 WL 4776986, at *21 (D. Mass. Sept. 30, 2019) ("Customer lists are expressly recognized as being a type of compilation of information that can qualify as a trade secret."); *Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 239 (D. Mass. 2011) (finding plaintiff showed a likelihood of success warranting issuance of preliminary injunction after determining that plaintiff was likely able to establish that its customer list was a trade secret).

As BWA's previous owner, Allen had access to BWA's email accounts that stored client email communications and other client information, including client names, nonpublic contact information, investment history and preferences, and other confidential financial information that BWA has expended significant resources collecting. Despite transferring ownership of these accounts and information and purporting to surrender access and control thereof, Allen wrongfully retained account login information, and thus that information.

Further, on Monday, July 29, 2024, the day he was launching his attempted theft of BWA's business, Allen attempted to further misappropriate BWA's trade secret information by contacting BWA's CRM vendor hosting BWA's client information and sought improper and unauthorized access to BWA's trade secret information under false pretenses of claiming he owned BWA. Allen's motivations at this point are clear: he is attempting to convince all that the 2022 transaction never happened (or was at some point unwound), and rather than repay the more than $2 million he received for the business, he is attempting to steal the business out from under its rightful

owners. It is also clear that Allen is planning to use the confidential and trade secret information to purloin BWA's clients for the benefit of his new entity and/or an interested entity, Florida Financial Advisors. Accordingly, BWA is highly likely to succeed on its claim under the DTSA.

### 3. BWA's Remaining Causes of Action

Although injunctive relief is warranted based on Allen's violations of the SCA and DTSA alone, BWA is likely to prevail on the remainder of the claims alleged in the verified complaint as well.

BWA is likely to succeed on its breach of contract claim, Count III of the Complaint. To prove breach of contract, BWA needs to show that there was a valid contract, Allen breached, and BWA sustained injury as a result. *See Linton v. N.Y. Life Ins. Corp.*, 392 F. Supp. 2d 39, 41 (D. Mass. 2005). BWA and Allen executed the Purchase Agreement and Bill of Sale dated March 1, 2022, whereby BWA, principally Mr. White and Ms. O'Connell, acquired 100% of Allen's ownership interest in the Balance Wealth Advisors business including all of Allen's rights to its tangible and intangible assets and accounts. In exchange, BWA agreed to pay Allen $2.9 million and immediately began paying monthly installments. Allen breached the Purchase Agreement almost immediately by refusing to transfer access or login credentials allowing BWA's purchasers to administrate BWA's electronic accounts. Allen's breach then escalated to extortion in late 2023 when he attempted to extract additional funds in exchange for turning over these credentials that he no longer owed, and to a violation of federal law on June 30, 2024, when he intentionally cut off access to the email accounts belonging to the people running the business and refused to restore their access or provide them with the login credentials needed to access their accounts and client emails. Accordingly, BWA is highly likely to succeed on its breach of contract claim.

BWA is likely to succeed on its tortious interference claim, Count IV of the Complaint. A claim of interference with an advantageous business relationship requires a showing that: (1) the

plaintiff had a known, advantageous relationship with a third party; (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions. *Hamann v. Carpenter*, 937 F.3d 86, 93 (1st Cir. 2019) (quoting *Blackstone v. Cashman*, 448 Mass. 255, 260 (2007)). As a financial services company, BWA provides personalized financial advisory services, financial consulting, retirement planning, risk assessment, insurance sales, and custom investment strategies. In order to conduct its business, BWA corresponds with clients via email and attracts new customers through its website. On July 30, 2024, Allen disabled BWA's access to its email accounts and temporarily shut down its website, thus cutting BWA off from its clients and leaving clients in the dark unable to confer with their financial advisor for several days in a time of financial volatility and uncertainty. Allen misused account credentials he wrongfully retained after selling his interest in the accounts to accomplish this treason and attempted to misdirect potential clients to his own new business venture. BWA is still scrambling to reconnect with clients, but expects that certain client relationships, as well as its reputation and goodwill, will be irreparably damaged as a result of Allen's misconduct.

Further, by converting BWA's website and email accounts for their own use, cutting off BWA's ability to communicate with clients and business partners, holding himself out as owner and member of BWA despite selling his interest in the company and relinquishing rights to its assets, diverting new and existing customers from BWA to his new unlicensed entity, Providence Financial Advisors, and hijacking BWA's business in an attempt to extract additional payment above and beyond the original purchase price of the business, Allen has engaged in unfair and deceptive trade practices and commercial extortion in violation of M. G. L. c. 93A. *See Airport*

*Fuel Servs., Inc. v. Martha's Vineyard Airport Comm'n*, 102 Mass. App. Ct. 642, 650, 212 N.E.3d 262, 270, *review denied*, 492 Mass. 1104, 215 N.E.3d 392 (2023) ("A breaching party's conduct rises to the level of a c. 93A violation if the breach was used 'as a lever to obtain advantage for the party committing the breach in relation to the other party; *i.e.*, the breach of contract has an extortionate quality that gives it the rancid flavor of unfairness.'") (quoting *Atkinson v. Rosenthal*, 33 Mass. App. Ct. 219, 226, 598 N.E.2d 666 (1992)). Accordingly, BWA is also likely to succeed on its Chapter 93A claim, Count V of the Complaint.

BWA is likely to succeed on its conversion claim, Count VI of the Complaint. A plaintiff alleging conversion under Massachusetts law must show that (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused. *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir. 1993). To prove conversion, a plaintiff must further demonstrate that "the defendant either did some positive wrongful act with the intention to appropriate the property to himself or to deprive the rightful owner of it, or destroyed the property." *Kelley v. LaForce*, 288 F.3d 1, 11-12 (1st Cir. 2002); *see Koch Acton, Inc. v. Koller*, No. CV 21-10374-FDS, 2024 WL 1093001, at *15 (D. Mass. Mar. 13, 2024).

As discussed above, Allen sold his ownership interest in the Balance Wealth Advisors business and associated accounts, including its website domain and email accounts in March 2022 in exchange for receiving $2.9 million and relinquished any legitimate right to control or access its email accounts. BWA, principally Mr. White and Ms. O'Connell, are the rightful owners of the

BWA Email accounts (among other property, including their personal funds). By cutting off BWA's access to its email accounts and controlling the accounts for himself, despite repeated and desperate requests for their return, Allen has wrongfully exercised dominion over the accounts. Allen also accessed personal bank accounts and funds belonging to Mr. White and Ms. O'Connell and used their funds to pay off his credit card and has failed to reimburse them despite multiple requests. Accordingly, BWA is highly likely to succeed on its conversion claim.

Lastly, at the heart of Allen's purported defense here is the issue of ownership of the Balance Wealth Advisors business. There is no question BWA, namely, Mr. White and Ms. O'Connell, are the rightful owners of this business and all associated assets, accounts, and information. As discussed above, Allen sold his interest in Balance Wealth Advisors in 2022 and executed a Purchase Agreement and Bill of Sale effecting that transfer. In exchange, Allen began receiving monthly installment payments amounting to over $2 million to date. Allen's claims of ownership now are entirely at odds with the plain language of the operative agreements and the conduct of the parties over the past several years. Accordingly, BWA is highly likely to succeed on its request for a declaratory judgment.

### B. BWA Will Suffer Immediate and Irreparable Harm If Allen is Not Enjoined from Further Violations

BWA has suffered and will continue suffering irreparable harm as a result of Allen's illegal and unethical conduct. BWA has already once been cut off from its business and cannot ensure its continued access to stored communications or ability to communicate with its clients using its most common form of correspondence. Allen's continued control of BWA's email accounts permits the untenable threat of Allen preventing BWA from engaging in its business of serving and corresponding with its clients and executing their directives. As Allen has formed his own, unlicensed advisory, PFA, Allen is poised to misuse BWA's client lists and confidential

information stored in BWA's email accounts and prevent BWA from fairly competing by hijacking its email accounts. BWA has lost or may lose customers because of losing communication for nearly a week (so far), and risks ramifications from financial services regulators for not acting with respect to client requests Allen has prevented BWA from receiving. *See F.H. Cann & Assocs., Inc. v. Moorman*, 605 F. Supp. 3d 232, 242 (D. Mass. 2022) (irreparable harm found warranting injunctive relief where plaintiffs would be "unable to exercise their complete rights over their property" and face a risk of permanent damage to goodwill) (citing *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996) ("By its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages. Accordingly, this kind of harm is often held to be irreparable.").

Despite receiving monthly payments of approximately $30,000.00 for the past two years, totaling well over $2 million so far, generated by the good work and success of BWA's owners, Allen is attempting to burn down the house he sold rather than watch it flourish in the hands of Mr. White and Ms. O'Connell. BWA is at his mercy unless and until the Court intervenes to preserve the *status quo* and ensure BWA's ability to continue operating and communicating with its clients, partners, and regulators – harms that cannot be reconciled through monetary damages alone. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996) (showing irreparable harm It is usually enough if the plaintiff shows that its legal remedies are inadequate).

Finally, even if BWA could not establish a likelihood of irreparable harm, which it plainly can, injunctive relief is still warranted here in light of the parties' Purchase Agreement which expressly provides for injunctive relief. *See Washington Tr. Advisors, Inc. v. Arnold*, 646 F. Supp. 3d 210, 220 (D. Mass. 2022) ("Massachusetts courts, including this Court, have generally enforced

these irreparable harm clauses" and entered preliminary injunctive relief). Moreover, when a plaintiff demonstrates likelihood of success on a misappropriation of trade secrets claim, it need not prove irreparable injury because such harm is presumed. *EchoMail, Inc. v. Am. Express Co.*, 378 F. Supp. 2d 1, 4 (D. Mass. 2005). That presumption applies here. *SpeeDee Worldwide, LLC v. Toppa*, No. 24-CV-10274, 2024 WL 1558386, at *4 (D. Mass. Apr. 10, 2024).

### C. The Balance of the Harms Weighs in BWA's Favor

The balance of harms weighs in favor of issuing an injunction. The requested injunction is narrowly tailored and seeks only to enforce the terms of the parties' Purchase Agreement and ensure BWA's access and control of its business accounts and thus preserve the status quo the parties have operated under since March 2022. *Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 41 n.5 (1st Cir. 2010) ("status quo may be determined by looking at the last uncontested status which preceded the pending controversy").

Here, plaintiffs seek a prohibitory preliminary injunction, which merely seeks to preserve the *status quo*, however, to the extent Defendants are required to take any pre-trial steps, the exigencies of this situation, namely Allen's pattern of disruptive and illegal conduct, demand such relief. *See Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency,* 649 F.2d 71, 76 n.7 (1st Cir.1981). Plaintiffs also seek a mandatory preliminary injunction. The standard for enacting a mandatory preliminary injunction considers the same four factors, with a particular "focus always must be on prevention of injury by a proper order, not merely on preservation of the *status quo*." *See Crowley v. Local No. 82,* 679 F.2d 978, 996 (1st Cir.1982), *rev'd on other grounds by* 467 U.S. 526, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984).

As the purpose of a preliminary injunction is to preserve the *status quo*, the most appropriate way to do so in this case is to allow *at minimum* both parties to have access to the

account information during the pendency of the litigation. *See Enargy Power Co. v. Xiaolong Wang,* No. CIV.A. 13-11348-DJC, 2013 WL 6234625, at *11 (D. Mass. Dec. 3, 2013) (citing *CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.*, 48 F.3d 618, 620 (1st Cir.1995) (noting that "[t]he purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs"). In light of the clear evidence that Allen sold and transferred his ownership interest in the BWA business and associated accounts, it is clear that potential harm Allen faces by disclosing the login credentials permitting BWA's continued operations as a business is outweighed by BWA's legitimate interest in unfettered access to its accounts, stored information and communications, and trade secret information during the pendency of the dispute. *See Enargy Power,* 2013 WL 6234625 at *11.

Allen will not be harmed if the if he is prevented from unlawfully exercising control over Mr. White's and Ms. O'Connell's email accounts, accounts he has no authorization or right to access or control after he sold 100% of his ownership interest in BWA and all associated assets and accounts in March 2022. Further, since selling his business in 2022, Allen has not been licensed to practice as a financial advisor and has not practiced. He is not currently licensed to practice as a financial advisor and cannot so perform. Preventing Allen from performing a heist of his former business to divert clients will not harm Allen as he has no license, right, or ability to practice in this field. *See, e.g. Yue Shao*, 2017 WL 4769445, at *8 (balance of harms in favor of granting injunction where defendant would not lose business revenue or otherwise suffer any quantifiable harm based on plaintiff's continued use of its own domain name, contrasted with substantial risk of harm preventing plaintiff from operating its business from the domain name).

### D. The Public Interest Favors an Injunction Against Allen

The requested injunctive relief will not harm the public interest. As demonstrated by the enactment of the SCA, it is in the public interest to prevent unauthorized access to stored communications and email accounts and to preclude bad actors from preventing authorized users to access their accounts. The same goes for the protection of trade secrets under the DTSA. It is further in the public interest to uphold agreements transferring ownership of businesses and ensuring that sellers transfer all assets and accounts necessary for completing the sale of a business and not holding back assets to later extort and extract additional payments once the purchasing parties understand they still require further cooperation from the seller. *See Dunkin' Donuts Franchised Restaurants LLC v. Wometco Donas Inc.*, 53 F. Supp. 3d 221, 232 (D. Mass. 2014) (concluding injunction served public interest as "defendants should not be rewarded for their seemingly bald-faced refusal" to honor obligations); *see also Yue Shao*, 2017 WL 4769445, at *8 ("A preliminary injunction would serve the public interest by preventing any further attempts to extort plaintiff" via misuse of plaintiff's confidential customer information).

Requiring Allen to disclose login credentials and turnover control of BWA's business accounts is in the public interest because it encourages adherence to contractual obligations. Requiring Allen to restore BWA's access and control of its email will therefore not disserve the public interest in any way.

**CONCLUSION**

For these reasons, Plaintiff respectfully requests that the Court grant these Motions.

Respectfully,

BWA LPW LLC,

*/s/ Erik W. Weibust*
Erik W. Weibust (BBO # 663270)
Adam R.D. Paine (BBO # 697246)
Epstein Becker & Green, P.C.
125 High Street, Suite 2114
Boston, Massachusetts 02110
Tel: (617) 603-1100
eweibust@ebglaw.com
apaine@ebglaw.com

Dated August 12, 2024                    *Attorneys for Plaintiff BWA LPW LLC*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on August 12, 2024, the foregoing document was filed through the CM/ECF system and served on counsel for Defendant via email as follows:

Martin Burke
Holland & Knight LLP
100 North Tampa Street, Suite 4100
Tampa, Florida 33602
Phone: 813.227.6704
Fax: 813.229.0134
Martin.Burke@hklaw.com


Daniel I. Small
Holland & Knight LLP
10 St. James Avenue, 11th Floor
Boston, MA 02116
Phone: 617.523.2700
Fax: 617.523.6850
dan.small@hklaw.com

*/s/ Erik W. Weibust*
Erik W. Weibust